UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COOPER-STANDARD
AUTOMOTIVE INC.,

      Plaintiff,

v.

DAIKIN AMERICA, INC.,

      Defendants.

_____/

Case No. 21-cv-12437

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION
FOR TEMPORARY RESTRAINING ORDER**

This is an automotive supply chain dispute over which the Court has diversity jurisdiction. On October 15, 2021 Plaintiff Cooper-Standard Automotive, Inc. ("Cooper-Standard") filed its four-count complaint against Defendant Daikin America, Inc. ("Daikin") for specific performance (Count I), declaratory judgment (Count II), breach of contract/anticipatory repudiation (Count III), and promissory estoppel (Count IV). Contemporaneous with the filing of its complaint, Cooper-Standard brought the present Motion For Temporary Restraining Order And Preliminary Injunction. (ECF No. 3.) Daikin opposes Cooper-Standard's motion and filed a brief in opposition. (ECF No. 5.) The Court held a hearing on October 22, 2021 wherein both parties participated in oral argument. For the reasons that follow, the Court GRANTS IN PART AND DENIES IN PART Cooper-Standard's motion.

1

I.      **Background**

Cooper-Standard and Daikin are parties to a supply relationship whereby Daikin supplies Cooper-Standard with 100% of Cooper-Standard's requirements of four unique products, known as resins.[1] (ECF No. 3, PageID.86.) Cooper-Standard incorporates the resins it receives from Daikin into various automotive parts that it then supplies to its automotive OEMs and automotive tier supply customers including Ford, GM, Volvo, and BMW. (*Id.* at PageID.83.) The Cooper-Standard parts are uniquely designed and then approved by its customers under the strict requirements of the production parts approval process. (*Id.* at PageID.86.) The resins from Daikin have undergone testing and validation for use in the Cooper-Standard parts, a process that takes many months. (*Id.* at PageID.86-87.)

Daikin and Cooper-Standard first began conducting business pursuant to a one-year contract that expired in 2013. (ECF No. 5, PageID.112.) Thereafter, Daikin states it continued to sell resins to Cooper-Standard "on a purchase order basis from 2013 to the present." (*Id.*) Cooper-Standard contends that the parties were most recently doing business pursuant to a certain scheduling agreement, dated October 23, 2018, that operates as a requirements contract (the "Scheduling Agreement"). (ECF No. 3, PageID.87; *see also* ECF No. 1-3, PageID.46.) Pursuant to the Scheduling Agreement, Cooper-Standard would issue "releases" on a regular weekly basis indicating both its current and projected volume requirements which Daikin is then required to supply. (ECF No. 3, PageID.87.)

---

[1] The unique resins are individually identified as Product 185, Product 186, Product 189, and Product 196.

The Scheduling Agreement provides:

> This scheduling agreement constitutes Buyer's purchase order and is subject to the Cooper Standard Automotive Inc. Purchase Order General Terms and Conditions as amended from time to time ("Terms") which are incorporated in full by this reference. . . . Acceptance of this purchase order is limited to the Terms, and Buyer objects to and rejects any additional or different terms. Subject to Buyer's termination rights, unless a quantity is specified this purchase order is a requirements contract under which Buyer will purchase and Seller will sell Buyer's requirements for Buyer's Plant identified above of the Products specified.

(ECF No. 1-3, PageID.47.)

Cooper-Standard's terms and conditions state that the Scheduling Agreement constitutes Cooper-Standard's entire offer notwithstanding any prior dealings between the parties and reiterates that the offer is limited to Cooper-Standard's terms:

> § 1.2. *This Purchase Order is an offer by Buyer to purchase the Products from Seller limited to the Terms and those terms reflected on the face of Buyer's Purchase Order*. The Purchase Order is effective, and a binding contract is formed, when Seller accepts Buyer's offer. . . . Seller will be deemed to have accepted the Purchase Order in its entirety without modification or addition*, notwithstanding any prior dealings or usage of trade*, upon the earliest of: (i) Seller commending work or performance with respect to any part of the Purchase Order; (ii) Seller delivering written acceptance of the Purchase Order to Buyer; (iii) shipment of Products or performance of services; or (iv) any conduct by Seller that fairly recognizes the existence of a contract for Buyer's purchase and Seller's sale of the Products. *The Purchase Order is limited to and conditional upon Seller's acceptance of the terms of the Purchase Order.* Any additional or different terms or conditions proposed by Seller . . . are deemed material and unacceptable to, and are rejected by, Buyer.

(§ 1.2, ECF No. 1-2, PageID.26) (emphasis added).

The terms and conditions also expressly provide that the contract formed between the parties is to be a requirements contract that will exist for the duration of "the applicable

3

manufacturer's program production life . . . as determined by Buyer's customer." (§ 2.1, ECF No. 1-2, PageID.26); that "Seller acknowledges that Buyer is purchasing Products for use in a tiered supply chain . . . [therefore] Seller agrees that it will not withhold or threaten to withhold the supply of Products at any time" (§ 2.4, ECF No. 1-2, PageID.27); that "[r]eleases are incorporated into, and are an integral part of, the Purchase Order and are not independent contracts" (§ 3.1, ECF No. 1-2, PageID.27); and that "Seller acknowledges that Buyer's pricing to Buyer's Customers for goods that incorporate the Products is based on pricing received from Seller for the Products . . . [accordingly,] prices are firm fixed prices for the duration of the Purchase Order and are not subject to increase for any reason . . ." (§ 6.1, ECF No. 1-2, PageID.28).

Upon receipt of the Scheduling Agreement, Daikin states it issued an "Order Acknowledgment," invoiced Cooper-Standard and shipped the ordered materials. (ECF No. 5, PageID.113.) The Order Acknowledgment contains the following language:

> Note that all products described herein or which are shipped by [Daikin] (DAI) hereafter are subject to the DAI general terms and conditions of sale. Any additional or different terms and/or conditions proposed by buyer are not binding on DAI and are hereby rejected, except if and to the extent specifically consented to in writing by an authorized DAI officer. This document acknowledges DAI's receipt of buyer's purchase order. All pricing, quantities, and fulfillment timing are subject to approval by DAI's sales representative.

(ECF No. 5-2, PageID.133.)

The parties conducted business without issue until recently. On August 31, 2021, Daikin's Key Account Executive emailed a letter to Cooper-Standard's Commodity Manager to inform her of Daikin's intention to increase prices for certain products effective October 1, 2021. (ECF No. 1-5, PageID.54; ECF No. 1-4, PageID.49.) The letter also

4

announced it was changing many of the contractual terms between the parties. (*Id.*) Cooper-Standard responded stating that it rejects the price increase based upon the language contained in the Scheduling Agreement and Cooper-Standard's terms and conditions. (ECF No. 1-5, PageID.52-53.) Thereafter, Daikin informed Cooper-Standard that the account would remain on hold and no products would be shipped until Daikin received notification that Cooper-Standard accepted Daikin's increased pricing proposal.[2] (ECF No. 1-10, PageID.71.)

In its present motion, Cooper-Standard seeks to enjoin Daikin from withholding the products or raising its prices. According to Cooper-Standard, it maintains enough products to supply its needs for six weeks or less after which its lines will shut down causing it to breach its own contracts with its customers and causing loss of good will, employee jobs, and other damages. (ECF No. 3, PageID.94, 101.) Due to the unique design of the products and the requirement that any new products undergo rigid testing requirements and approval by the OEMs, Cooper-Standard states that it is unable to identify a new supplier on short notice and would require at least 12 months to transition to an alternate supplier.

## II. Legal Standard

Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of a temporary restraining order ("TRO"). The Sixth Circuit has explained that the purpose of a TRO under Rule 65 is to preserve the status quo until the Court has had an opportunity to determine whether a preliminary injunction should issue. *First Tech. Safety Sys, Inc. v.*

---

[2] Daikin simultaneously threatened to stop shipping products due to a dispute between the parties regarding a $15,971.25 invoice that remained unpaid. Cooper-Standard alleges the invoice is for defective material and that Cooper-Standard properly notified Daikin that the material was defective pursuant to the parties' dispute process. (ECF No. 1-6, PageID.57.)

5

*Depinet*, 11 F.3d 641, 650 (6th Cir. 1993). The Court considers four factors in determining whether to issue a TRO: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008).

## III.   Analysis

### A.   Likelihood of Success on the Merits

Cooper-Standard states that it is likely to succeed on the merits of its claim because Daikin has anticipatorily repudiated the valid, binding and enforceable requirements contract between the parties by threatening to withhold shipment of the products. By contrast, Daikin argues that "the contractual documents governing the supply of resins, as well as the parties' conduct, establish that the parties always agreed that [Daikin] had the right to adjust its prices and to allocate its inventory among various customers." (ECF No. 5, PageID.119-120.) The Court must therefore consider whether the parties had a contract and if they did, what the terms of that contract included.

Michigan law applies to this dispute. (*See* § 31.2, ECF No. 1-2, PageID.41.) Michigan's version of Article 2 of the Uniform Commercial Code ("MUCC"), Mich. Comp. Laws §§ 440.2101-.2725, "governs the relationship between parties involved in contracts for the sale of goods." *Grosse Pointe Law Firm, PC v. Jaguar Land Rover N. Am., LLC*, 317 Mich. App. 395, 400 (2016) (citing Mich. Comp. Laws § 440.2102). The so-called "battle of the forms" provision of the MUCC provides:

> Sec. 2207. (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a

6

>reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>>(a) the offer expressly limits acceptance to the terms of the offer;
>>(b) they materially alter it; or
>>(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
>(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

Mich. Comp. Laws § 440.2207. Under this section, there appears to be a valid, binding, and enforceable contract between the parties.

At its most basic level, a contract is formed when there is an offer, acceptance, and consideration. In this case, Cooper-Standard issued its offer to Daikin as the October 23, 2018 Scheduling Agreement which incorporated Cooper-Standard's terms and conditions. (See ECF No. 1-3, PageID.47) ("Acceptance of this purchase order is limited to the Terms, and Buyer object to and rejects any additional or different terms."). Daikin accepted this offer and a contract was formed when Daikin issued its Order Acknowledgment, "a definite and seasonable expression of acceptance," *see* Mich. Comp. Laws § 440.2207(1), and shipped the products to Cooper-Standard along with an invoice.

As for the terms of the parties' contract, an analysis of Mich. Comp. Laws. § 440.2207 shows that Cooper-Standard's terms and conditions govern. While Daikin's

7

Order Acknowledgment purported to "reject" different terms or conditions proposed by Cooper-Standard, it did not expressly make its acceptance conditional on Cooper-Standard's assent to Daikin's terms. (*See Order Acknowledgment*, ECF No. 5-3, PageID.137) (stating that its products and shipments "are subject to the [Daikin] general terms and conditions of sale" and that "[a]ny additional or different terms and/or conditions proposed by buyer are not binding on [Daikin] and are hereby rejected . . .."). Daikin's willingness to do business even by terms other than its own is evident by its immediate shipment of the products without regard to whether Cooper-Standard expressed its assent to Daikin's terms.

Because both Cooper-Standard and Daikin are merchants within the meaning of of Mich. Comp. Laws 440.2104(1),[3] ordinarily Daikin's additional terms would have become part of the contract. *See* Mich. Comp. Laws 440.2207(2) (providing that "[b]etween merchants such terms become part of the contract" unless one of three exemptions applies.) But in this case, Cooper-Standard expressly limited acceptance of its offer to its own terms and conditions. (*See* ECF No. 1-3, PageID.47) ("Acceptance of this purchase order is limited to the Terms, and Buyer object to and rejects any additional or different terms."). Thus, Mich. Comp. Laws 440.2207(2)(a) applies and Daikin's terms did not become part of the contract.

Under Cooper-Standard's terms and conditions, made part of the contract through the language in the Scheduling Agreement, Daikin agreed "that it will not withhold or threaten to withhold the supply of Products at any time" (§ 2.4, ECF No. 1-2, PageID.27), and that prices of the products "are firm fixed prices for the duration of the Purchase Order

---

[3] Mich. Comp. Laws § 440.2104 provides that a "merchant" is one "that deals in goods of the kind . . ."

and are not subject to increase for any reason . . ." (§ 6.1, ECF No. 1-2, PageID.28). Accordingly, Daikin's actions in unilaterally raising the prices of the products and threatening to withhold the products constitute breaches of the contract or anticipatory repudiation. Cooper-Standard has therefore shown a likelihood of success on the merits.

This factor weighs in favor of Cooper-Standard.

### B. Irreparable Harm

"A showing of 'probable irreparable harm is the single most important prerequisite' " to granting injunctive relief. *Lucero v. Detroit Public Schools*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) (quoting *Reuters Ltd. v. United Press Int'l., Inc.*, 907 (2d Cir. 1990). A party's harm is "irreparable" when it cannot be adequately compensated by money damages. *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008). For an injury to constitute irreparable harm, it must also "be certain, great, and actual." *Lucero,* 1160 F. Supp. at 801 (citing *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C.Cir.1985)).

In this case, Cooper-Standard states that its lines will inevitably shut down without Daikin's products causing catastrophic effects on the supply chain of automotive parts, the loss of customer goodwill, employee job termination, and other damages for which there would be incalculable losses. (ECF No. 3, PageID.101.) Daikin responds by arguing that Cooper-Standard can "cover" and secure its continued supply of resins by agreeing to pay the increased prices Daikin announced in its August 31 letter and pricing schedule. (ECF No. 5, PageID.117.) Relying on this Court's opinion in *Eberspaecher*, Daikin states that Cooper-Standard controls its own fate and can choose to pay the increased prices or suffer the damages it describes. *See Eberspaecher*, 544 F. Supp. 2d at 603.

But the Court in *Eberspaecher* did not require the buyer to pay increased prices newly instituted by the seller, as Daikin would have Cooper-Standard do here. *Id.* Rather, in that case, this Court decided the motion in favor of the seller after the buyer unilaterally decided to pay $46.13 per automotive part, as opposed to the $49.50 contract price, accumulating a debt of more than $460,000. *Id.* at 594-95. In other words, the Court found it necessary to preserve the status quo.

The Court therefore agrees with Cooper-Standard and finds that this factor weighs in favor of granting its motion. The "just-in-time" nature of the automotive supply chain provides potential for large-scale disruption if just one of the down-line companies is unable to fulfill its obligations under contract. *See Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012) ("the potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court.") Moreover, while a buyer may have the responsibility to "cover" in order to lessen its damages, *see* Mich. Comp. Laws § 440.2715(2), this typically refers to a buyer's ability to procure similar goods from a different distributor. In this case, due to the unique nature of Daikin's products and the testing and certification requirements of Cooper-Standard's customers, it would not be possible to secure alternate products from a different supplier. *See TRW Inc. v. Indus. Sys. Assoc. Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002) (affirming preliminary injunction by district court based upon a finding of irreparable harm where automaker could not readily obtain air bags from another source and that plaintiff's goodwill and business reputation would be harmed absent injunctive relief.)

### C. Whether an Injunction Would Cause Substantial Harm to Others and Whether the Public Interest Would be Served by Issuing the Injunction

Cooper Standard asks the Court to maintain the status quo so as to keep all the affected businesses in the supply chain operating. Without injunctive relief, Cooper-Standard points out that disastrous consequences will be felt by its customers and its customers' customers up the supply chain.

The Court agrees and finds that the remaining factors weigh in favor of a temporary restraining order. The public interest is best served by requiring parties to a contract to abide by their agreement. *Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 848 (E.D. Mich. 1994). The public interest also weighs in favor of the efficient administration of the automotive industry. *Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C.*, No. 08-CV-10558, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008) (holding that public interest factor weighed in favor of injunctive relief where compelling seller to supply automotive part would avoid consequential plant shutdown or layoffs and would avoid economic harm to the state, region, and nation); *see also Almetals Inc. v. Wickeder Westfalenstahl, GmbH*, No. 08-10109, 2008 WL 4791377, at *10 (E.D. Mich. Oct. 29, 2008) ("Denying the injunction places at risk the operations at Almetals, and, correspondingly, numerous customer assembly plants. This would be disastrous, irreparably damaging Almetals' business and reputation, and causing further detriment to the economy. Additionally, the public interest is served by requiring Wickeder to abide by its contractual agreement.")

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 3.) With respect to Plaintiff's motion for temporary restraining order, the motion is

**GRANTED** and the Court hereby issues a temporary restraining order which will remain in effect from the date and time this order is issued through the latest date and time allowable under Federal Rule 65. With respect to Plaintiff's motion for preliminary injunction, Plaintiff's motion is **DENIED**. The parties may stipulate to convert this order to one for preliminary injunction. Absent such stipulation, the Court will set the matter for hearing and issue a briefing schedule. Pursuant to Federal Rule of Civil Procedure 65(c), the Court orders Plaintiff to post a bond in the amount of $15,971.25 plus $13,000 per month each month until this Order expires or is vacated.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: October 26, 2021

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 26, 2021, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager